UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROY DUANE CALHOUN,

        Petitioner,

                              CASE NO. 05-CV-74614-DT

v.                           JUDGE ROBERT H. CLELAND
                              MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH T. McKEE,

        Respondent.[1]

_____/

**REPORT AND RECOMMENDATION**

*Table of Contents*

| | | |
|---|---|---|
| I. | RECOMMENDATION | 2 |
| II. | REPORT | 2 |
| | A. *Procedural History* | 2 |
| | B. *Factual Background Underlying Petitioner's Conviction* | 4 |
| | C. *Procedural Default* | 8 |
| | D. *Standard of Review* | 10 |
| | E. *Severance (Claim I)* | 12 |
| |    1. *Clearly Established Law* | 12 |
| |    2. *Analysis* | 13 |
| | F. *Suppression of Statement (Claim II)* | 14 |
| |    1. *Factual Background Relating to Petitioner's Statement* | 15 |
| |    2. *Voluntariness* | 16 |
| |       a. Clearly Established Law | 17 |
| |       b. Analysis | 18 |
| |    3. *Right to Remain Silent* | 20 |
| |       a. Clearly Established Law | 20 |
| |       b. Analysis | 21 |
| | G. *Ineffective Assistance of Counsel (Claims III & IV)* | 22 |
| |    1. *Clearly Established Law* | 23 |
| |    2. *Trial Counsel (Claim III)* | 23 |
| |    3. *Appellate Counsel (Claim IV)* | 25 |
| | H. *Conclusion* | 25 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | 25 |

_____

    [1]By Order entered this date, Kenneth T. McKee has been substituted for Kenneth Romanowski as the proper respondent in this action.

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

        1.      Petitioner Roy Duane Calhoun is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

        2.      On September 22, 2000, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Genesee County Circuit Court.  On October 11, 2000, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to a term of 30-50 years' imprisonment on the armed robbery conviction, a concurrent term of 58 months' to 25 years' imprisonment on the felon in possession conviction, and a mandatory consecutive term of two years' imprisonment on the felony firearm conviction.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.      MR. CALHOUN'S TRIAL COUNSEL DID NOT MEET CONSTITUTIONALLY PRESCRIBED STANDARDS FOR COMPETENT COUNSEL AND THUS, MR. CALHOUN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHICH COMPROMISED HIS DEFENSE AT TRIAL AND ADVERSELY AFFECTED THE TRIAL RESULT TO HIS DETRIMENT.

        II.     THE TRIAL COURT DEPRIVED MR. CALHOUN OF HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS BY DENYING HIS MOTION TO SEVER HIS TRIAL FROM THAT OF HIS CO-DEFENDANT GISTOVER.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Calhoun*, No. 231209, 2002 WL 31105032 (Mich. Ct. App. Sept. 20, 2002) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these two issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Calhoun*, 468 Mich. 907, 661 N.W.2d 583 (2003).

5.      On May 24, 2004, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising claims regarding the assistance of counsel and the admission of his confession to the police.  The trial court denied the motion on June 1, 2004. Petitioner thereafter filed an applications for leave to appeal in the Michigan Court of Appeals and Michigan Supreme Court, raising three claims:

I.      DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, WHERE HIS TRIAL ATTORNEY COMMITTED SERIOUS ERRORS, THUS DENYING HIM OF [sic] CONSTITUTIONALLY PRESCRIBED EFFECTIVE ASSISTANCE OF COUNSEL.

II.     TRIAL COURT SHOULD HAVE SUPPRESSED DEFENDANT'S STATEMENT WHERE POLICE FAILED TO MAKE AN AUDIO OR VIDEO RECORDING OF THEIR INTERROGATION, FAILED TO HAVE DEFENDANT WRITE OUT AND SIGN STATEMENT, OR MAKE ANY DOCUMENTATION OF STATEMENT OR INTERROGATION.

III.    DEFENDANT ROY CALHOUN WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE HIS APPELLATE ATTORNEY DID NOT RAISE THE ABOVE ISSUES IN HIS APPEAL OF RIGHT.

The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Calhoun*, 474 Mich. 895, 705 N.W.2d 117

3

(2005); *People v. Calhoun*, No. 257114 (Mich. Ct. App. Dec. 16, 2004).

6.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 6, 2005. As grounds for the writ of habeas corpus, he raises the claims raised in his direct appeal and motion for relief from judgment. In his memorandum in support of the petition filed on July 24, 2006, petitioner sets forth his bases for relief as four claims:

I.     THE TRIAL COURT DEPRIVED PETITIONER OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY DENYING HIS MOTION TO SEVER HIS TRIAL FROM THAT OF HIS CODEFENDANT.

II.     THE TRIAL COURT SHOULD HAVE SUPPRESSED PETITIONER'S STATEMENT TO POLICE WHERE INTERROGATING OFFICER FAILED TO MAKE AN AUDIO OR VIDEO RECORDING OF STATEMENT OR INTERROGATION, FAILED TO WRITE OUT OR HAVE PETITIONER WRITE OUT AND SIGN, OR MEMORIALIZE STATEMENT IN ANY WAY.

III.     PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, WHERE COUNSEL COMMITTED SERIOUS ERRORS, THUS FAILING TO MEET CONSTITUTIONALLY PRESCRIBED STANDARDS FOR COMPETENT COUNSEL.

IV.     THE PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE APPELLATE COUNSEL'S REPRESENTATION WAS CONSTITUTIONALLY DEFICIENT, THUS PREJUDICING PETITIONER ON HIS APPEAL OF RIGHT.

7.     Respondent filed his answer on June 19, 2006. He contends that petitioner's claims are barred by petitioner's procedural default in the state courts.

8.     On July 24, 2006, petitioner filed a reply to respondent's answer, a brief in support of his petition, a motion for discovery, and a motion for evidentiary hearing.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted of armed robbery and firearm possession offenses following a joint jury trial with his codefendant, Tartheon Gistover. The evidence adduced at trial was accurately

4

summarized in the prosecutor's brief on appeal in the Michigan Court of Appeals:

On January 5, 2000, there was a robbery at the Great Giant Laundry and Dry Cleaners on North Saginaw Street, Genesee Township. (T 135-136). Paul Kachudas, the owner of the Laundromat, was working there that day with one employee, Jeannie Billington. (T 136; T 181). Calhoun was in the Laundromat at that time. (T 190). The doors to the Laundromat were locked. (T 138). A man approached and shook them. (T 139, T 183). That man was identified as the co-defendant Gistover separately by Calhoun in his police statement and at trial by Calhoun and witnesses Kachudas and Billington. (T 184) Kachudas testified that he called out to the man that the Laundromat was closed. (T 139). Instead of leaving co-defendant Gistover walked all the way over until he was even with Kachudas and "mouthed" something. Gistover stayed at the window "mouthing" something to him twice, before Kachudas sent Billington to see what the man wanted at the door. (T 140). When she opened the door, Gistover asked her if they were accepting job applications and she answered no. (T 183). Billington locked the door and told Kachudas. (T 140). Gistover, still did not leave, but walked slowly back over until he was even with Kachudas again. (T 140). Gistover stayed looking at him for a time and then left. (T 140).

Kachudas described the man as black, with short hair, black leather coat, an earring in the right ear and a mustache. (T 142, 233). Billington described the man as black, wearing a leather coat. (T 184).

Calhoun finished his laundry and left, and then re-entered to ask Billington if she was seeing anyone. (T 190) Billington left work at around 12:35 p.m. (T 193). Kachudas reopened the Laundromat after the power came back on. (T 143). After a dry cleaning customer left, Kachudas turned around and there was a man standing at the counter. (T 144). Kachudas testified that this was the same man who had earlier shook the doors and walked in front of the windows asking for a job application, (T 142, 144) and he identified the same man as co-defendant Gistover. (T 172)

Gistover told Kachudas not to make any noise and to give him all the money in the register, a cash drawer and his own pockets. (T 145). Kachudas estimated the total amount of cash taken was close to $300 in cash, consisting of $20, $10, $5, and $1 denominations. Kachudas testified that there were more $1 bills than any other denomination. (T 146). At the robber's direction, Kachudas then went into the bathroom. (T 146). Kachudas then called 911. (T 146).

Officer Stephen Warda, of the Mt. Morris Township Police Department, responded to a radio transmission at 1:15 p.m. regarding a robbery that had occurred at around 1:00 p.m., and a description of the suspect. (T 202-203). As Warda approached the Laundromat, he observed a black male wearing a black jacket walking hurriedly through the parking lot of the Northgate Bar. (T 203, 206). Warda continued to observe the man approach a car and make a "motion with his right hand as if he was tossing something into the front seat." (T 207-209). Warda identified this man as defendant Calhoun. (T 206). Warda stopped Calhoun and completed a pat-

down search discovering a cell phone and a large wad of currency. (T 210-211). This money was counted and totaled at $292. There were 112 - $1 bills; 16 - $5 bills; 2 - $10 bills; and 4 - $20 bills (T 270). An additional $26 was later removed from another pocket. (T 269). Warda explained he was investigating an armed robbery (T 211). Calhoun kept insisting that Warda bring "him" (referring to the male victim) to the scene for identification. (T 210-211). Warda looked through the windows of Calhoun's car and observed a gun lying on the floorboard directly in front of the driver's seat. (T 211-212). No prints were found on the gun. (T 259-260). Kachudas was driven to Northgate Bar to view the suspect Calhoun. Kachudas informed the police that this positively was not the man that robbed him that the earring was on the wrong side. (T 150-151, 263-264).

Detective Gary Mastin interviewed Calhoun at the police station after Calhoun waived his Miranda rights. (T 237-238). Mastin tape-recorded his interview with Calhoun (T 249). Calhoun denied the robbery. (T 241). When asked about the gun, Calhoun stated he had done his laundry at the Laundromat, returned to the area to do a drug transaction and saw a man throw down a gun. Calhoun stated he picked up the gun and was carrying it to his car when the police arrested him. (T 250). Calhoun asked if Mastin could arrange a deal for him if he "came forward and told the complete truth." (T 241). Mastin went to Lieutenant Cherry and informed him of Calhoun's request. (T 240, 242, 265-266). Lieutenant Cherry took over the interview after re-affirming "Miranda" warnings and informing Calhoun that the police cannot make a deal, only the Prosecutor. (T 242; 266-267). Cherry told him the best way he can help himself is to make a truthful statement, thereafter Calhoun made a second statement. (T 267). Lieutenant Cherry testified that Calhoun confessed to assisting Gistover, by taking the gun and the money after the robbery so that if Gistover were stopped he would not be caught with it on him. (T 268, 307). Calhoun admitted receiving the money from the robbery, which was to be split afterwards, and the gun from the robber. (T 271). During this interview of Calhoun, Cherry drew a map of the area noting "where vehicles were parked," which way Gistover ran, etc., based on his dialogue with Calhoun. (T 272). An enlargement of the drawing was admitted into evidence. (T 273).

Calhoun, at trial, admitted the story about the drug-drop was a lie and said the story the police were reporting was a lie. Calhoun testified that he had lied about the bogus drug deal because he was on "parole and not wanting to return to prison for a gun that was not his." (Def. App B 6)(Defendant's Brief on Appeal). Calhoun testified he didn't want to tell on his friend Gistover, but he didn't want the gun to put him back in jail. (T 363-364). Calhoun's third story, his testimony at trial, was that he had seen Gistover knock on the door of the Laundromat when it was locked up during the power outage. (T 350). He testified he didn't know what was communicated between Gistover and Billington. He testified that he knew Gistover prior to that day and had last seen him right after Christmas. (T 350). Calhoun testified that he had picked up Gistover in the area of the Laundromat to give him a ride to his car at the Northgate Bar when Gistover told him "he hit a lick". (T 356). At trial Calhoun denied his police statement, denying he ever said he assisted

6

Gistover, or assisted Cherry with drawing the map, or ever took the money from Gistover. (T 354-358). However, he did testify at trial that he saw Gistover at the Laundromat and got the gun from Gistover after Gistover told him "he hit a lick". (T 356).

January 6, 2000, Kachudas was shown a photo array of six pictures. (T 294-296). Kachudas did not identify anyone. (T 297).

Later that day it turned out the police were able to pick up Gistover and he was arrested. After he waived his Miranda rights, Mastin and Cherry interviewed Gistover. (T 242-243, 276). A tape recording of this interview contained Gistover admitting to being in Mt. Morris on Wednesday, January 5th in the year 2000, around 1:10 p.m. (T 470). At his initial interview with Cherry, Gistover declared, "Okay, I want to talk about this off the tape first." (T 471). Gistover told them he would tell them what happened as long as they turned off the tape recorder and then later he would repeat with the tape recorder on. (T 278). He indicated to the officers that he had gone to [a] friend's house and touched a handgun and then left. (T 278). He went to the Great Giant Laundromat and asked for a job application, and then went home. (T 278). He told them he was stopped at the door and not allowed to go in the Laundromat as the power was out. He said later when the power came back on he went into the Laundromat and asked for some change, claiming he never committed a robbery, but was only thinking about doing robbery. (279). When the officer went to phone the parole agent during the interview to inform the agent that Gistover had contact with a gun, Gistover suddenly denied having made a statement to the officer. (281). He refused to make a statement on tape. (T 281). He never mentioned any alibi or that he was at work throughout the police interview even after asked where he was at 1:00 p.m. on January 6, 2000.

At the line up January 20, 2000, Kachudas was told the defendant might or may not be in the line-up. (T 283). Cherry testified at trial that there had been a change in Gistover's appearance since his arrest, photo array and line-up. He testified that Gistover had hair on his head, hair under his lip and a mustache at the time of arrest. At the time of line-up he had shaved his head, his hair under his lip and his mustache. (T 285). Kachudas did not identify anyone at the line-up. (T 245). After the line up Kachudas asked, "Did the guy that robbed me change his appearance?" and the officer said "yes" and then Kachudas replied "I wish I had known that before I went in there, cuz it was number two." (T 246, T 283). Gistover was in position number two in the line-up. (T 246). Both officers testified they never told Kachudas that the defendant was present or where he was in the line up. (T 246, T 283). Kachudas testified that he identified Gistover as the robber during the preliminary exam (T 155-156) and again at trial (T 152).

Both Calhoun and Gistover denied what the officers reported as their statements and gave a different statement at trial. Calhoun testified at trial that he knew Gistover, that he saw Gistover shake the door of the Laundromat on the day of the robbery and later saw Gistover leaving the Laundromat area and gave him a ride to his car. He testified Gistover convessed he "hit a lick" and left the gun in Calhoun's car. (T 356). Calhoun said he never had anything to do with the robbery

and that the money, the 112 - $1 bills, the 16 - $5 bills; the 2 - $10 bills; and the 4-$20 bills which were found on him when he was arrested, was money he was stashing to keep from his wife so she didn't spend too much. (T 362). He testified it was not unusual for him to stash and carry 100 $1 bills. (T 362).

Gistover testified at trial that he had an alibi, he was at Cherrylane, Flint, at work at the time of the robbery and never was in Mt. Morris, near the Laundromat, or saw Calhoun on that day. Gistover testified he had ended his shift at 12 noon, and then went to a friend's house in Beecher. (T 417). He said he went from there to his other job at Black Sunshine Studios. (T 417). Gistover had his employment supervisors testify. Charles Woods testified that he was Gistover's third cousin and his supervisor at his job with the Genesee County Park and Recreation at "Crossroads Village." (T 398). Woods was not present at work January 5, 2000, but testified that records report Gistover left work "somewhere about 12:00 or 12:30" that day. (T 399). Woods also testified that "Crossroads Village" was about an eight to ten minute drive from the Laundromat. (T 411). Johnson testified that based on "records" Gistover had come into work between 1:00-1:15 p.m. Johnson did not remember that Gistover had a mustache on the date of the robbery. (T 412). Both Woods and Johnson testified that there was a difference in Gistover's appearance between the photographs of him on January 6, 2000 and January 20, 2000. (T 403, 413). Gistover testified he did not want the tape running when he was interviewed by the officers because he "didn't want his parole officer to hear that I was out in Beecher ... getting ready to gamble ... findin' out where we was gonna gamble" in a private residence. (T419, 421). Later when asked about this motive, Gistover testified that if the Officer had told his parole agent that he was "getting ready to gamble, I'd been like they lyin', you know. I wasn't gamblin'." (T 430). His motive was contradicted by the fact that his tape recorded voice at the police interview had Gistover admitting to being in Mt. Morris at 1: 10 p.m. and his explanation for lying to the police was inconsistent by his own testimony. (T 419, 421, 430).

People's Br. on App., in *People v. Calhoun*, No. 231209 (Mich. Ct. App.), at 2-9.

C.    *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v.*

8

*Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

At the outset, respondent's procedural default argument fails with respect to petitioner's severance claim, and with respect to the portion of petitioner's ineffective assistance of trial counsel claim relating to his statement to the police.  These claims, although also raised on petitioner's motion for relief from judgment, were first raised in a procedurally proper manner in petitioner's appeal of right.  Thus, the claims are not procedurally defaulted.  With respect to the remaining claims, even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits.  As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts.  Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate that appellate counsel

9

was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

10

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

11

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.     *Severance (Claim I)*

Petitioner first contends that he was denied a fair trial by the trial court's failure to sever his trial from that of his codefendant.

1.     *Clearly Established Law*

As a general matter, there is no constitutional right to severance. In *Zafiro v. United States*, 506 U.S. 534 (1993), the Court considered "whether Rule 14 [of the Federal Rules of Criminal Procedure] requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" *Zafiro*, 506 U.S. at 535. Thus, *Zafiro* did not establish any rule of constitutional law, and is inapplicable to petitioner's state court conviction. *Cf. Williams v. Singletary*, 114 F.3d 177, 181 (11th Cir. 1997) (noting that *Zafiro* involved an interpretation of the Federal Rules of Criminal Procedure and thus "it is not at all clear that *Zafiro* establishes a rule of constitutional law to be applied to state court judgments in § 2254 proceedings," but finding

12

it unnecessary to resolve the question); *Henry v. Scully*, 918 F. Supp. 693, 714 n.7 (S.D.N.Y. 1995) ("Petitioner's counsel argues that Henry's trial counsel erred in failing to request a severance. This argument, which depends upon Henry's having had a constitutional right to a severance, is without merit.  Henry has shown no federal constitutional right to a severance.").

Thus, habeas relief will be warranted for a trial court's failure to sever a petitioner's trial from that of his codefendants only where the denial itself deprives the petitioner of a fundamentally fair trial.  In other words, "a state trial court's refusal to grant severance mandates habeas corpus relief (1) when the joint trial 'resulted in the deprivation of a specific constitutional guarantee such as the right to call witnesses . . . or the right to confrontation,' or (2) when the joint trial abridged the defendant's 'fundamental right to a fair trial as secured by the Fourteenth Amendment.'" *Turpin v. Kassulke*, 26 F.3d 1392, 1404 (6th Cir. 1992) (Feikens, D.J., concurring in part and dissenting in part) (quoting *Jenkins v. Bordenkircher*, 611 F.2d 162, 168 (6th Cir. 1979)); *accord Fox v. Ward*, 200 F.3d 1286, 1292 (10th Cir. 2000); *Hoodt v. Helling*, 141 F.3d 892, 896 (8th Cir. 1998).  Where the denial of a specific constitutional right is not involved, a failure to sever results in a denial of a fair trial only if there "is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Under this prong of the test, severance is generally mandated only in three situations: (1) where there is compelling evidence admitted against a codefendant which would not otherwise be admissible against the defendant; (2) where the sheer number of defendants and charges makes it impossible for the jury to separate the issues involved; and (3) where the defendant's involvement in the crime is significantly different in scope or magnitude from that of his codefendants.  *See United States v. Blankenship*, 382 F.3d 1110, 1123-25 (11th Cir. 2004).  However, joint trials are favored, and the potential for prejudice

13

alone is insufficient to mandate severance.  *See Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).

      2.    *Analysis*

      Here, petitioner has identified no constitutional rights which he was denied by the failure of the trial court to sever his case from those of his codefendants, nor has he shown that he was denied a fair trial.  Nor has he identified any factors which would question whether the jury was able to reliably assess his guilt.  The quantum and type of evidence against petitioner and his codefendant were similar, the charges were not numerous or complex, and the scope of petitioner's involvement was not significantly less than that of his codefendant.  Petitioner has thus failed to point to specific instances of prejudice resulting from the failure to sever his trial.  *See Vincent v. Seabold*, 226 F.3d 681, 691 (6th Cir. 2000).  Specifically, as the Michigan Court of Appeals explained, "[w]here the prosecutor charges one defendant as a principal and the other as an aider and abettor, finger pointing by the defendants does not create mutually exclusive antagonistic defenses."  *Calhoun*, 2002 WL 31105032, at *3, slip op. at 4 (internal quotation and alterations omitted); *see also*, *Zafiro*, 506 U.S. at 538 ("[M]utually antagonistic defenses are not prejudicial *per se*."); *United States v. Smith*, 197 F.3d 225, 230 (6th Cir. 1999) ("The fact that each defendant attempts to lay the blame at the feet of the other defendant is not reason enough for severance without a showing that the jury is unable to treat evidence applicable to each defendant distinctively.").  Further, as the Michigan Court of Appeals explained, the trial court properly instructed the jury on the burden of proof and the need to consider the charges against each defendant individually.  *See Calhoun*, 2002 WL 31105032, at *3, slip op. at 4; Trial Tr., Vol. III, at 437, 444-45.  The jurors are presumed to have followed these instructions, and the instructions therefore ameliorated any potential prejudice.  *See Stanford*, 266

14

F.3d at 459 (citing *Francis v. Franklin*, 471 U.S. at 307, 324 n.9 (1985)).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Suppression of Statement (Claim II)*

Petitioner next contends that he was denied a fair trial by the trial court's failure to suppress his statement to the police.  Petitioner contends that his statement should have been suppressed because: (1) it was not recorded; (2) it was the result of coercive interrogation techniques; and (3) it was taken in violation of his right to remain silent.

1.      *Factual Background Relating to Petitioner's Statement*

Detective Mastin testified that he interviewed petitioner following his arrest.  Prior to the interview, Detective Mastin informed petitioner of his *Miranda* rights, and petitioner signed the waiver form.  *See* Trial Tr., Vol. II, at 237-39.  Petitioner initially denied participating in the robbery, and did not identify anyone else as being involved.  *See id.* at 241.  Detective Mastin told petitioner that he did not believe petitioner, and petitioner became nervous and asked if he could get a better deal if he told the truth.  *See id.*  At that point, Detective Mastin concluded the interview and contacted Lt. Cherry.  *See id.* at 242.  Detective Mastin taped the interview with petitioner.  He could not recall whether he took the tape recorder with him when he left, or if he just put it away someplace in his office.  *See id.* at 249-50.  However, his comment about petitioner lying and petitioner's request for a deal were both made after he had ended the recording.  *See id.* at 250.

Lt. Cherry testified that he went into the interview room after Detective Mastin had told him about petitioner's request.  He again went over the *Miranda* rights with petitioner.  *See id.* at 266. Lt. Cherry did not promise any deal to petitioner; rather, he told petitioner that he should give a truthful statement, and that the statement could be given to the prosecutor, who was the only one

with the authority to make any deals.  *See id*. at 267.  Petitioner then gave a statement to Lt. Cherry, in which he indicated that he did not physically rob the victim, but that his role was to receive the money and the gun afterwards, so that if Gistover got stopped he would not have these items on his person.  *See id*. at 268, 307.  This statement conflicted with the statement petitioner had given Detective Mastin.  *See id*. at 271.  With petitioner's assistance, Lt. Cherry prepared a map of the area showing who had gone where during the robbery.  *See id*. at 272-75.  Lt. Cherry did not tape the interview with petitioner, because he did not see a tape recorder in the room and had not entered the room with the intention of questioning petitioner.  Rather, he had gone in only to explain to petitioner that the police could not make a deal with him.  *See id*. at 288, 308-09.

Petitioner testified that he had lied to Detective Mastin when he told Mastin that he had been in the area to do a drug deal and had found the gun.  *See* Trial Tr., Vol. III, at 363, 388.  After talking with Mastin, he told Mastin "to get the prosecutor either there or on the telephone, because I wanted the prosecutor to hear exactly what I had to say."  *Id*. at 364, 388.  Mastin picked up the phone and appeared to talk to someone at the prosecutor's office.  When he hung up, Mastin said that no prosecutor was available and that if petitioner gave a statement, he would make sure that the prosecutor got it.  *See id*.  At that point Detective Mastin left, and Lt. Cherry came in shortly after. Lt. Cherry told him that he would give any statement petitioner made to the prosecutor, but that the police cannot make any deals.  *See id*. at 365.  According to petitioner, the tape recorder was still on the desk when Lt. Cherry came in to the room.  *See id*.  Petitioner denied telling Lt. Cherry that he was in any way involved in the crime, and denied assisting Lt. Cherry in drawing the map.  *See id*. at 365-66, 391, 393-94.

2.      *Voluntariness*

Petitioner first argues that his confession was not voluntary because it was not recorded and was the result of coercive interrogation techniques. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. Clearly Established Law

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376. "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson*, 120 S. Ct. at 2331. It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible. "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the

17

questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

For purposes of habeas review, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a [legal] matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, a state court's findings of historical fact are presumed by this Court to be correct unless rebutted by petitioner with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). *See generally*, *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (factual findings entitled to a presumption of correctness under the habeas statutes are those relating to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.") (internal quotation omitted). Thus, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254[(e)(1)] presumption." *Miller*, 474 U.S. at 112; *see also*, *id.* at 117.

### b. Analysis

Here, petitioner does not allege that the police interrogation of him was significantly long or occurred in a coercive atmosphere. He does not allege that the police mistreated him in any way, or deprived him of food, water, or needed medical attention. Rather, petitioner makes two challenges to his statement to the police. First, he contends that the statement should have been excluded because it was not recorded or memorialized in any written form. Second, he argues that the questioning was coercive because Detective Mastin acted as if he was calling the prosecutor's

18

office upon petitioner's request.  Neither of these facts rendered petitioner's statement involuntary.

With respect to the failure to record or otherwise memorialize the statement, petitioner is not entitled to habeas relief because no clearly established law as determined by the Supreme Court requires that a confession be recorded or set forth in writing.  *See Trice v. Ward*, 196 F.3d 1151, 1170 (10th Cir. 1999); *Calicut v. Quigley*, No. 05-CV-72334, 2007 WL 37751, at *4 (E.D. Mich. Jan. 3, 2007) (Roberts, J.); *Crenshaw v. Renico*, 261 F. Supp. 2d 826, 837 (E.D. Mich. 2003) (Edmunds, J.).  To the extent that petitioner argues the failure to record the statement provides evidence that he did not, in fact, confess any involvement in the crime to Lt. Cherry, this was a fact for the jury to determine, not an issues relating to the voluntariness of any statement which was given.  *See United States v. Arthur*, No. 1:06cr140-MHT, 2006 WL 2971619, at *4 (M.D. Ala. Oct. 17, 2006).

With respect to Detective Mastin's phone call to the prosecutor, even if as petitioner alleges Detective Mastin's call was merely a ruse and Detective Mastin lied when he told petitioner that a prosecutor was not available, petitioner cannot show that his confession was thereby rendered involuntary.  It is well established that "[t]rickery, deceit, even impersonation do not render a confession inadmissible unless government agents make threats or promises."  *United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007) (internal quotation and alteration omitted); *accord United States v. Crawford*, 372 F.3d 1048, 1061 (9th Cir. 2004) (en banc).  "[T]rickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Soffer v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (en banc) (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)).  Here, neither Detective Mastin nor Lt. Cherry made any threats or promises, and Detective Mastin's

19

phone-call ruse (if it was such) did not deprive petitioner of knowledge essential to his ability to understand his rights or the consequences of waiving them. On the contrary, Lt. Cherry truthfully informed petitioner that the police could not make a deal, but that any cooperation would be passed on to the prosecutor. In short, petitioner cannot show that Detective Mastin's alleged ruse was sufficiently coercive as to have overborne his will and caused him to involuntarily confess. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

       3.     *Right to Remain Silent*

Petitioner also contends that the admission of his confession was improper because it was taken after he had invoked his right to remain silent, in violation of *Miranda* and his Fifth Amendment privilege against self-incrimination. The Court should conclude that this claim is without merit.

*a. Clearly Established Law*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court considered the applicability of the Fifth Amendment's Self-Incrimination Clause to custodial interrogations by the police. The Court ruled that, in some circumstances, statements made while in custody can violate the Self-Incrimination Clause even if the statement was otherwise "voluntary" under the Due Process Clause. As the Court has more recently explained, the *Miranda* decision

> concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." [*Miranda*, 384 U.S.] at 439. Accordingly, we laid down "concrete guidelines for law enforcement agencies and courts to follow." *Id.*, at 442. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that

> he has the right to the presence of any attorney, and that if he cannot afford an
> attorney one will be appointed for him prior to questioning if he so desires." *Id.*, at
> 479.

*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (parallel citations omitted). The *Miranda*

Court explained that if the suspect indicates that he wishes to remain silent, "the interrogation must

cease." *Miranda*, 384 U.S. at 474. Similarly, if the suspect requests counsel "the interrogation must

cease until an attorney is present." *Id.*; *see also*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Although it has been characterized otherwise at times, the rule of *Miranda* is of federal

constitutional dimension. *See Dickerson*, 530 U.S. at 438-40. Thus, claims based on the right to

counsel at questioning recognized in *Miranda* are cognizable on habeas review. *See id.* at 439 n.3;

*Thompson v. Keohane*, 516 U.S. 99, 107 n.5 (1995).

        In determining the validity of the police interrogation, the ultimate issues of whether

petitioner waived his rights to remain silent and to counsel are legal determinations to be reviewed

under § 2254(d)(1). *See, e.g.*, *Thompson*, 516 U.S. at 112-13 (determination of whether

interrogation was a "custodial interrogation" under *Miranda* is a legal determination not subject to

the presumption of correctness for state court findings of historical fact); *Brewer v. Williams*, 430

U.S. 387, 397 n.4 (1977) (same as applied to question of whether petitioner validly waived his Sixth

Amendment right to counsel). However, as with the voluntariness issue, the state courts' resolution

of the underlying historical facts are presumed correct unless rebutted by clear and convincing

evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

### b. Analysis

        Petitioner contends that he invoked his right to remain silent when he told the police that he

only wanted to talk in the presence of a prosecuting attorney. In order to require the police to cease

questioning, a suspect's invocation of the right to remain silent must be unequivocal. *See United States v. Hurst*, 228 F.3d 751, 759-60 (6th Cir. 2000); *United States v. Hicks*, 967 F. Supp. 242, 249-50 (E.D. Mich. 1997) (Rosen, J.). As the Supreme Court has explained, where a request to cease questioning is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood that the suspect *might* be invoking the right [to remain silent], our precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459 (1994).[2] Here, petitioner's request to speak with a prosecutor was not an unequivocal invocation of his right to remain silent. On the contrary, petitioner's request indicated that he wanted to talk, albeit in front of a prosecuting attorney. In light of petitioner's stated desire to talk, a reasonable officer in the position of Lt. Cherry would not have understood petitioner's request as an invocation of his right to remain silent. *Cf. Fare v. Michael C.*, 442 U.S. 707 (1979) (juvenile suspect's request to speak with probation officer did not constitute an invocation of either the right to remain silent or the right to counsel); *State v. Galli*, 967 P.2d 930, 934 (Utah 1998) (citing state and federal cases establishing that request to speak with a prosecutor does not constitute an invocation of the right to counsel). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Ineffective Assistance of Counsel (Claims III & IV)*

Petitioner next claims that he was denied the effective assistance of both trial and appellate counsel. Specifically, petitioner contends that trial counsel was ineffective for failing to: (1) move for an evidentiary hearing on his coerced confession claim; (2) question Detective Mastin about his

---

[2]*Davis* involved an equivocal invocation of the right to counsel under *Miranda*. However, "every circuit that has addressed the issue squarely has concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent." *Bui v. DiPaola*, 170 F.3d 232, 239 (1st Cir. 1999). The Sixth Circuit, by which this Court is bound, is among this group of courts. *See Hurst*, 228 F.3d at 759-60.

reported call to the prosecutor's office and petitioner's invocation of his right to remain silent; and (3) failing to call a Genesee County Jail employee as a defense witness. Petitioner also contends that appellate counsel was ineffective for failing to raise his habeas issues on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

    1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the

23

reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.   *Trial Counsel (Claim III)*

Petitioner contends that trial counsel was ineffective for failing to move for an evidentiary hearing on his coerced confession claim. As explained above, however, even assuming that petitioner's account of the interrogation is correct, as a matter of law the confession was voluntary and proper under *Miranda*. Thus, petitioner cannot show that counsel was deficient for failing to seek an evidentiary hearing, nor can he show that he was prejudiced by the absence of a hearing. Likewise, questioning Detective Mastin about his call to the prosecutor's office and petitioner's purported invocation of the right to remain silent did not affect the outcome of the case, because these matters, even if true, did not render petitioner's confession inadmissible.

With respect to the Genesee County Jail employee, Vickie Hurly, petitioner provides an affidavit in which Ms. Hurly avers that she was visited at the jail by petitioner's wife, who was trying to find out information about petitioner. Hurly spoke with Lt. Cherry, who told her that he "did not know if he could get Mr. Calhoun for this crime, but with his (Mr. Calhoun's) criminal record, he (Lt. Cherry) would be sure to get him for something." Pet'r's Br., Ex. A, Aff. of Vickie Hurly, ¶ 6. Even assuming the truth of this statement and that Hurly's testimony concerning Lt. Cherry's statement would have been admissible under the hearsay rule, however, petitioner cannot show that he was prejudiced by counsel's failure to call Ms. Hurly. Contrary to petitioner's argument, Lt. Cherry's statement did not express an opinion on petitioner's guilt, only on the sufficiency of the evidence that the police had at the time Lt. Cherry spoke with Ms. Hurly. It may

24

have provided evidence of Lt. Cherry's motive to fabricate petitioner's statement to the police, but this additional evidence would not have provided a reasonable probability of the outcome being different in light of the other evidence against petitioner, namely:  his possession of cash consistent with that taken from the laundromat; his possession of a gun; and his being at the laundromat around the time of the robbery.  In light of this evidence, there is not a reasonable probability that, had the jury been aware of Lt. Cherry's statement to Ms. Hurly, the result of the proceeding would have been different.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 3.    *Appellate Counsel (Claim IV)*

Petitioner also contends that appellate counsel was ineffective for failing to raise his habeas claims on direct appeal.  To show prejudice in the context of an appellate counsel claim, petitioner must show that his claims would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  As explained in this Report, petitioner's claims are without merit.  Thus, he cannot show that he was prejudiced by counsel's failure to raise these claims on direct appeal.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  The Court should also deny petitioner's motions for discovery and an evidentiary hearing.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 3/26/07

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 26, 2007.

s/Eddrey Butts
Case Manager